Paul Rachmuth Law Office, PLLC
265 Sunrise Highway, Ste. 1515
Rockville Centre, New York 11570
Tel: (516) 330-0170
paul@paresq.com

Hearing Date and Time
March 12, 2026 at 9:30 a.m.

*Attorney for Benjamin P. Dixon*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

1819 WEEKS AVE. REALTY CORP.

Debtor.

Chapter 11

Case No. 24-11855-JPM

<u>**BENJAMIN DIXON'S OBJECTION TO CONFIRMATION**</u>
<u>**OF DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN**</u>
<u>**OF LIQUIDATION OF 1819 WEEKS AVE. REALTY CORP.**</u>

TO:    THE HONORABLE JOHN P. MASTANDO III
       UNITED STATES BANKRUPTCY JUDGE

Pursuant to 11 U.S.C. § 1129(a), Benjamin P. Dixon ("Dixon"), by and through his

undersigned counsel, Paul Rachmuth Law Office, PLLC, respectfully submits this Objection to

Confirmation of the Debtor's Second Amended Chapter 11 Plan of Liquidation (the "Plan"):

<u>**PRELIMINARY STATEMENT**</u>

`        Confirmation must be denied because the Plan fails to account for borrower-funded reserve

and escrow accounts established under the loan documents, improperly assumes the allowance and

payment of default interest to the purported secured creditor despite unresolved accounting and

servicing issues relating to those funds, contains impermissibly broad release and exculpation

provisions, and fails to adequately preserve potential estate causes of action. These defects violate

11 U.S.C. §§ 1123(a), 1123(b)(3), and 1129(a)(1) and render the Plan unconfirmable as a matter of law.

The Plan also improperly permits the secured creditor to assert default interest based on alleged tax defaults without first reconciling or applying funds held in borrower-funded escrow, imposition, tax and insurance escrow, and reserve accounts required under the loan documents and transferred with the assignment of the loan. Because the existence, transfer, and application of those funds directly affects whether any default occurred and whether default interest may be charged, confirmation cannot be granted without a full accounting of the escrow and reserve accounts and the assignment chain.

Moreover, under 11 U.S.C. § 506(b), an oversecured creditor may recover post-petition interest only to the extent such interest is reasonable and enforceable under applicable law, and bankruptcy courts retain equitable discretion to deny default-rate interest where the alleged default is disputed, technical, or caused in part by the creditor's own conduct. Here, the Plan assumes entitlement to default interest without resolving material disputes concerning the lender's administration of borrower-funded escrow and reserve funds and the validity of the alleged tax default.

In short, the Plan cannot be confirmed because: (i) the amount of the alleged secured claim cannot be determined without an accounting of borrower-funded escrow and reserve accounts; (ii) the record does not establish which party possessed authority to declare a default following the assignment of the loan; and (iii) the Plan improperly assumes entitlement to default interest without first establishing a valid default under applicable law.

## PROCEDURAL BACKGROUND

1.      Dixon is a tenant residing at the premises located at 47 Perry Street in Manhattan (the "Building"), which is owned by the Debtor, 1819 Weeks Ave. Realty Corp.

2.      Dixon, together with co-plaintiff and claimant Christoph Meinrenken, commenced an action in the Supreme Court of the State of New York, County of New York, entitled *Benjamin Dixon et al. v. 1819 Weeks Ave. Realty Corp., Nancy Haber, and XYZ Corp.*, Index No. 161138/2019 (the "Supreme Court Action"). The Supreme Court Action seeks lease reformation, monetary damages for rent overcharge, treble damages pursuant to the New York Rent Stabilization Law, statutory attorneys' fees, compensatory damages for breach of the warranty of habitability, and injunctive relief. Copies of relevant docket entries and pleadings in the Supreme Court Action are annexed hereto as Exhibit A.

3.      On October 28, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

4.      On March 21, 2025, Dixon filed an unliquidated proof of claim in this case (Claim No. 5, the "Dixon Claim") based upon the damages sought in the Supreme Court Action.

5.      The Dixon Claim incorporates the pleadings filed in the Supreme Court Action and seeks recovery of actual damages for rent overcharge, treble damages, statutory attorneys' fees, and compensatory damages arising from alleged breaches of the warranty of habitability.

6.      The Debtor filed its First Amended Plan of Liquidation of 1819 Weeks Ave. Realty Corp., dated December 23, 2025 (the "Plan"), in this Chapter 11 case.

7.      The Plan is a liquidating Chapter 11 plan rather than a reorganization and contemplates the sale of the Debtor's primary asset, the Building located at 47 Perry Street.

8.      According to the Debtor's filings, the proposed sale price for the Building is approximately $10.5 million.

9.       Under the Plan, the proceeds of the proposed sale are intended to be used to pay administrative expenses, municipal fines, New York State taxes, priority claims, and the alleged secured claim of Maguire Perry LLC. The Plan further provides for a $10,000 contribution by Maguire Perry for the benefit of unsecured creditors.

10.      The Debtor's memorandum in support of confirmation does not provide evidence demonstrating that Maguire Perry holds or possesses the Note or otherwise explain the full chain of assignments of the loan or the treatment of escrow accounts, tax impound accounts, or reserve funds associated with the loan documents.

## Debtor 1819 Weeks Loan History and Assignment Chain

11.      The following paragraphs summarize the relevant loan history and assignment chain relating to the Debtor's property at 47 Perry Street, including the creation of tax escrow, imposition, and reserve accounts that bear directly on the alleged tax default and the calculation of the secured claim.

12.      The lending chain begins with a mortgage executed by 1819 Weeks Ave. Realty Corp. in favor of Cohoes Savings Bank in the original principal amount of $150,000, dated September 7, 1989 and recorded September 20, 1989 in the Office of the City Register of the City of New York. See NYC ACRIS Mortgage recorded September 20, 1989 (New York County Register).

13.      The original Cohoes mortgages were subsequently assigned by First Niagara Bank, successor in interest to Cohoes Savings Bank, to First Niagara Funding, Inc. pursuant to an Assignment of Mortgage dated November 6, 2010 and recorded November 26, 2010 in the

New York County Register. See NYC ACRIS Assignment of Mortgage recorded November 26,

2010. In connection with that assignment, the borrower executed a new Mortgage C in favor of

First Niagara Funding, Inc. in the amount of $491,689.61, and the parties entered into a

Consolidation, Extension and Modification Agreement consolidating Mortgages A, B, and C into

a single lien in the principal amount of $700,000. See NYC ACRIS CEMA recorded in 2010

(New York County Register). The 2010 transaction reflects a consolidation and modification of

the existing debt but does not establish a separately identified tax escrow or cash collateral

reserve account at closing.

14.     In 2012, Debtor 1819 Weeks Ave. Realty Corp. executed an Additional Mortgage

in the amount of $438,043.96 in favor of First Niagara Funding, Inc. The existing mortgage

indebtedness of $661,956.04 and the new mortgage were combined through a further

Consolidation, Extension and Modification Agreement into a single consolidated mortgage

securing a loan in the principal amount of $1,100,000. See NYC ACRIS CEMA recorded

January 14, 2013 (New York County Register, the "2012 CEMA"). The 2012 CEMA does not

create a tax escrow account. Instead, it requires the borrower to pay taxes directly and provides:

"Mortgagor will pay prior to the addition of any penalty or interest thereon all taxes, assessments
and other charges which may be levied against the Premises."
(2012 CEMA, Sect. 3.2 – Payment of Taxes and Assessments).

15.     This provision constitutes a standard covenant requiring direct payment of taxes

and does not require the borrower to deposit tax funds with the lender. The mortgage also

requires notice prior to declaration of default, including for nonpayment of taxes.

16.     In 2016, the borrower and First Niagara Bank executed a further Consolidation,

Extension and Modification Agreement consolidating the existing mortgages. The 2016 CEMA

identifies existing indebtedness of $971,677.75 and additional indebtedness of $1,250,000,

resulting in a consolidated mortgage lien in the principal amount of $2,221,677.75. See NYC

ACRIS CEMA recorded in 2016 (New York County Register, the "2016 CEMA"). The 2016

CEMA expressly combines the prior mortgage liens into a single consolidated lien, thereby

absorbing the previously subordinate mortgage and restating the consolidated indebtedness.

17.     The 2016 CEMA also contains standard borrower covenant requiring payment of

taxes, assessments, water charges, and sewer charges. The agreement provides that the borrower

must pay property taxes when due and states:


"Mortgagor will pay or cause to be paid prior to the accrual of any penalty or interest thereon all
taxes, assessments, payments in lieu of taxes, charges, sewer bills and water rates levied against
the Premises."
(2016 CEMA, Sect. 3.2 – Payment of Taxes and Assessments).

18.     The key provision in the 2016 CEMA is Section 3.19 – Real Estate Tax and

Insurance Account, which creates a mandatory tax and insurance escrow (referred to in the

agreement as an "Imposition Account"). Section 3.19 provides that the borrower shall deposit

with the mortgagee monthly sums equal to one-twelfth (1/12) of the annual real estate taxes and

insurance premiums, to be held in an "Imposition Account." *Id.* The section further provides:

On the date hereof, if requested by Mortgagee, Mortgagor will deposit with Mortgagee a lump
sum in the amount necessary to establish a fund which, with the monthly payments, will be
sufficient for payment of such Impositions as they become due and payable.
                * * *
Mortgagee shall apply such sums held by Mortgagee pursuant to this Section 3.19 to the payment
of such Impositions unless directed to do so by Mortgagor in writing during a period of time
when no Event of Default shall exist.

*Id.*

19.     Under this provision, the borrower deposits funds each month for taxes,

insurance, and similar charges, and those funds are held by the lender and applied to the payment

of those obligations as they become due.

20.     The existence of this escrow or impound system places responsibility on the lender to apply the escrowed funds to the payment of taxes and insurance when due. If the funds held in the account are insufficient, the clause allows the mortgagee to advance funds and add those advances to the loan balance.

21.     The KeyBank CEMA dated January 10, 2018 states that prior mortgage indebtedness totaled $3,090,135.73 and that the modification created a consolidated lien in the amount of $3,790,135.73. See Consolidation, Extension and Modification Agreement dated Jan. 10, 2018, recorded in the Office of the City Register of the City of New York, New York County. The mortgage schedule attached to that agreement also recaps the earlier 1989, 2000, 2010, 2012, 2014, and 2016 transactions.

22.     The Broadfield CEMA dated June 12, 2020 consolidates the prior mortgages into a single loan secured by a mortgage on the real property, an assignment of leases and rents, and a security interest in fixtures, personal property, and cash reserve accounts held by the lender Broadfield. See NYC ACRIS Consolidation, Extension and Modification Agreement recorded June 2020.

23.     Paragraph 5 of the Broadfield CEMA creates a Tax and Insurance Escrow Fund requiring the borrower to make monthly payments equal to one-twelfth (1/12) of the annual property taxes and one-twelfth (1/12) of the annual insurance premiums. See Broadfielth CEMA §5, recorded in NYC ACRIS, CRFN [insert CRFN]. The Tax and Insurance Escrow Account under the Broadfield loan is a lender-controlled escrow account pledged as additional collateral but earmarked primarily for the payment of taxes and insurance.

24.     The Broadfield CEMA provides that the Tax and Insurance Escrow Fund transfers with the note upon assignment because the escrow account is pledged as additional

7

collateral securing the loan. See Broadfield CEMA §5. Accordingly, the Tax and Insurance Escrow Fund travels with the note and mortgage upon assignment.

25.    The Debtor later obtained new financing from Fairbridge Credit LLC and executed the Fairbridge CEMA dated October 20, 2022, with an effective date of July 1, 2022. The Fairbridge documents show that the Broadfield mortgage was assigned through a series of assignments before ultimately being consolidated with a new gap mortgage dated July 1, 2022 in the amount of $1,100,000. See NYC ACRIS Consolidation, Extension and Modification Agreement recorded 2022.

26.    Paragraph 5 of the Fairbridge CEMA establishes a Tax and Insurance Escrow Fund requiring the borrower to make monthly deposits in addition to the principal and interest payments under the loan. Paragraph 5 provides:

"Mortgagor shall pay to Mortgagee on the first (1st) day of each calendar month an amount equal to one-twelfth (1/12) of the annual Taxes and Insurance premiums … which amounts shall be held by Mortgagee in the Tax and Insurance Escrow Fund."

See Fairbridge CEMA §5, recorded in NYC ACRIS.

27.    In addition, paragraph 2 of the Fairbridge CEMA indicates that the lender was holding interest reserves pursuant to a Cash Collateral and Interest Reserve Agreement executed in connection with the loan.

28.    The Debtor, 1819 Weeks Ave. Realty Corp., made monthly installment payments under the Fairbridge loan that have not been accounted for in this bankruptcy proceeding or in the Plan. The Plan likewise provides no accounting of payments made directly to Fairbridge Credit LLC or to its subsequent assignee, Maguire Perry.

29.     On or about December 15, 2022, Fairbridge Credit LLC assigned the mortgages to Fairbridge Strategic Capital LLC. See Assignment of Mortgage recorded on December 21, 2022.

30.     Fairbridge Strategic Capital LLC then reassigned the mortgage to Maguire Perry on December 15, 2022, and that assignment was also recorded in NYC ACRIS on December 21, 2022. See Assignment of Mortgage recorded Dec. 21, 2022, New York County Register.

31.     On December 28, 2022, Maguire Perry executed a Memorandum of Collateral Assignment of Note, Mortgage, and Other Loan Documents assigning the Mortgage, Note, and Loan Documents to Felicitas Debt Fund LP. See Memorandum of Collateral Assignment recorded in NYC ACRIS, New York County Register.

32.     The Tax and Insurance Escrow Funds created under the Broadfield and Fairbridge CEMAs, together with the Interest Reserve Account established under the Fairbridge loan documents, would have transferred with the Note and Mortgage upon that assignment and therefore must be accounted for in determining the balance of the alleged secured claim.

33.     The assignment by Maguire Perry to Felicitas Debt Fund LP was executed and effective on December 28, 2022, which was before the alleged default by Debtor 1819 Weeks.

34.     The assignment was recorded in NYC ACRIS on January 4, 2023. See NYC ACRIS Assignment of Mortgage, recorded Jan. 4, 2023.

35.     Paragraph 7 of the Leibowitz Declaration alleges that Debtor 1819 "defaulted under the Loan Documents" by (i) failing to pay property taxes on January 1, 2023 and (ii) failing to pay the loan upon the May 1, 2023 maturity date. Leibowitz Decl. ¶ 7, ECF No. 25.

9

36.    Both alleged defaults occurred after December 28, 2022—the date on which Maguire Perry assigned the Mortgage, Note, and Loan Documents.

37.    It is unclear how Maguire Perry could declare a tax default as of January 1, 2023. The loan documents established a lender-controlled tax and insurance escrow fund funded by borrower deposits designated for the payment of property taxes and insurance obligations. Under the mortgage, the interaction between the escrow provisions and the default provisions is significant because the lender is required to apply escrowed funds to those obligations as they become due. If the escrow account contains insufficient funds to satisfy a tax obligation, the loan documents require the noteholder to notify the borrower of the deficiency and demand additional deposits before declaring a default based on nonpayment of taxes. The borrower also retains the right under the loan documents to contest or cure any alleged default arising from the nonpayment of taxes.

38.    The assignment history raises a fundamental standing defect. The recorded Memorandum of Collateral Assignment shows that Maguire Perry assigned the Note, Mortgage, and Loan Documents to Felicitas Debt Fund LP on December 28, 2022. See NYC ACRIS Assignment of Mortgage recorded Jan. 4, 2023.

## OBJECTION TO CONFIRMATION

39.    The foregoing facts demonstrate that the authority to declare default, assess default interest, and enforce the loan is materially disputed as a result of the assignment chain and the administration of borrower-funded escrow and reserve accounts.

40.    Nevertheless, the Plan assumes the validity of the secured claim and the creditor's entitlement to default interest without resolving these issues.

41.     The confirmation of a plan requires compliance with the Bankruptcy Code and accurate determination of creditor claims, the Plan cannot be confirmed in its present form.

42.     The Dixon therefore submits the following objections to confirmation.

**OBJECTION I --- Secured Claim cannot be determined without accounting for Escrow and Reserve Funds**

43.     The Plan cannot be confirmed because it fails to account for borrower-funded reserve and escrow accounts created under the loan documents, including the Interest Reserve Account and the Tax and Insurance Escrow Fund. The Fairbridge loan documents required the borrower to fund these accounts for the payment of property taxes, insurance, and related loan obligations, yet the Plan provides no accounting of the balances of those accounts or how such funds were applied. Instead, the Plan treats the secured claim as though no such reserves exist and effectively requires the Debtor to satisfy those same obligations again through Plan payments, even though any escrow or reserve funds collected for taxes and insurance must be credited against the secured claim before additional payment obligations may be imposed.

44.     The Bankruptcy Code requires that the allowed amount of a secured claim reflect the actual debt owed after accounting for all payments, credits, and collateral held by the creditor. See 11 U.S.C. § 506(a)(1); *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449 (2007).

45.     Reserve accounts funded by the borrower and held by the lender constitute either payments reducing the underlying debt or collateral securing the loan and must therefore be credited when determining the amount of an allowed secured claim. See 11 U.S.C. §506(a); *In re Milham*, 141 F.3d 420, 423 (2d Cir. 1998); *In re 785 Partners LLC*, 470 B.R. 126, 133–34 (Bankr. S.D.N.Y. 2012); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 798 (5th Cir. 1997). Given that the Plan does not disclose the balances of these accounts or their application to the

loan, the Court cannot determine the correct amount of the alleged secured claim or whether the

Plan satisfies the confirmation requirements of the Bankruptcy Code. See 11 U.S.C. §§

1129(a)(1), 1129(a)(7).

46.    Escrow and imposition accounts created under the loan documents travel with the

assignment of the note and mortgage, and any successor lender must account for borrower-

funded escrow deposits when determining the amount of the secured claim. See *U.S. Bank N.A.

v. Eaddy*, 79 A.D.3d 1021 (2d Dep't 2010); *In re Vest Assocs.*, 217 B.R. 696 (Bankr. S.D.N.Y.

1998).

47.    In the present case, the creditor seeks default interest based on a tax default even

though the loan documents required the lender to hold borrower-funded escrow deposits

earmarked for the payment of those taxes. If escrow funds existed but were not applied to the tax

obligation, the alleged default may be lender-created and the creditor cannot benefit from its own

failure to administer the escrow account.

48.    Where loan documents require borrower deposits into a lender-controlled escrow

account earmarked for the payment of property taxes, a creditor may not declare a tax default

without first accounting for and applying those escrow funds.

49.    The United States Trustee has also identified serious deficiencies in the Debtor's

financial reporting, including transfers exceeding $125,000 through electronic payments and

more than $53,000 to unidentified third parties. See Declaration of Annie Wells ¶¶ 13–14, *In re

1819 Weeks Ave. Realty Corp.*, No. 24-11855 (Bankr. S.D.N.Y.), ECF No. 140-1. These issues

further underscore the absence of reliable financial records in this case.

50.    The Debtor's confirmation declaration likewise provides no loan accounting,

payoff statement, payment history, or documentation establishing the amount or validity of the

alleged secured claim. See Declaration of Nancy Haber ¶ 10, *In re 1819 Weeks Ave. Realty Corp.*, No. 24-11855 (Bankr. S.D.N.Y.), ECF No. 139.

51.     Bankruptcy courts retain discretion under 11 U.S.C. § 506(b) to deny default interest where enforcement would be inequitable or unsupported by the record. See *In re Vest Assocs.*, 217 B.R. 696 (Bankr. S.D.N.Y. 1998); see also *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959).

52.     Because the Plan assumes the validity and amount of the secured claim—including default interest—without resolving these issues, the Court cannot determine the proper amount of the claim for purposes of confirmation.

53.     Confirmation should therefore be denied unless the Debtor provides a full accounting of the escrow and reserve funds and establishes the proper amount of the secured claim.

## **OBJECTION II. ---- The Plan fails to specifically preserve estate causes of action**

54.     The Plan should not be confirmed because it fails to adequately preserve potential causes of action belonging to the bankruptcy estate. It is well established that a chapter 11 plan must specifically preserve estate causes of action if the debtor intends to retain and pursue them following confirmation.

55.     Section 1123(b)(3) of the Bankruptcy Code permits a plan to "provide for the retention and enforcement by the debtor… of any such claim or interest." 11 U.S.C. §1123(b)(3).

56.     Article 6.7 of the Plan purports to preserve causes of action and provides in relevant part:

> "Except as otherwise provided in the Plan… the Debtor or any party in interest shall retain any claims, rights and causes of action (i) arising under sections 510 and 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtor as of the

13

Petition Date… arising under any provision of state or federal law, or any theory of statutory or common law or equity."

Article 6.7 further provides:

"Any recovery received by the Debtor through the prosecution, settlement or collection of any claim, right or cause of action, shall be retained by the Debtor following the satisfaction of all other Allowed Claims under the terms of the Plan."

57.     Although the Plan contains this general reservation clause, it fails to identify with any specificity the estate causes of action that are purportedly being preserved. Courts consistently hold that generalized reservation language of this type is insufficient to preserve estate claims following confirmation.

58.     Courts require that a chapter 11 plan contain a specific and unequivocal reservation of causes of action so that creditors may evaluate the potential value of those claims when considering whether to vote in favor of the plan.

59.     In *In re United Operating, LLC*, the court held that a debtor must "expressly retain the right to pursue such actions in the plan of reorganization," and that failure to do so results in the claims being barred after confirmation. *In re United Operating, LLC*, 540 F.3d 351, 355–56 (5th Cir. 2008).

60.     Courts within this Circuit similarly require that a plan specifically identify the claims being preserved. See *In re I. Appel Corp.*, 300 B.R. 564, 568 (Bankr. S.D.N.Y. 2003) (holding that a plan must contain a "specific and unequivocal reservation of claims" in order to preserve them post-confirmation).

61.     Where a plan fails to adequately identify or preserve estate causes of action, those claims may be deemed waived or abandoned upon confirmation. See *In re Ice Cream Liquidation, Inc.*, 319 B.R. 324, 337–38 (Bankr. D. Conn. 2005).

14

62.     The requirement of specificity exists to ensure that creditors voting on a plan are able to assess the potential value of estate causes of action and determine whether the proposed treatment of their claims is fair and equitable.

63.     The Plan here provides for the liquidation of the Debtor's primary asset and the distribution of the sale proceeds but fails to expressly preserve any specific estate causes of action, including but not limited to claims relating to: a) the validity of the secured creditor's lien, b) the enforceability of the loan documents, c) the calculation of default interest, d) the propriety of the proposed secured claim, e) claims arising from the attempted UCC foreclosure of the Debtor's equity interests, f) the loss, misappropriation, or conversion of interest reserve funds, g) the loss, misappropriation, or conversion of interest tax and insurance escrow funds or segregated funds belonging to the Debtor that were supposed to be used to pay property taxes and insurance bills.

64.     The Plan contemplates payment of approximately $8.5 million to Maguire Perry LLC on account of its alleged secured claim. However, the record suggests that potential disputes exist regarding the chain of assignments of the loan, the disbursement of loan proceeds, the handling of escrow and reserve accounts, the validity and calculation of default interest, and the legality of the attempted foreclosure by Maguire Perry on the Debtor's equity interests.

65.     These issues may give rise to legally cognizable causes of action belonging to the bankruptcy estate, including claim objections under 11 U.S.C. § 502, equitable subordination under 11 U.S.C. § 510(c), damages arising from commercially unreasonable foreclosure under UCC § 9-625, and declaratory judgment actions concerning lien validity and enforceability. In addition, the estate may possess claims arising from the misappropriation or improper handling of escrow funds and reserve accounts.

66.    By failing to specifically preserve these potential causes of action, the Plan risks extinguishing valuable rights belonging to the estate and its creditors upon confirmation.

67.    The Plan also fails to establish any litigation trust or other mechanism to prosecute potential estate claims for the benefit of creditors. The absence of such provisions creates a substantial risk that valuable claims will be lost upon confirmation while the alleged secured creditor receives payment in full.

68.    Because the Plan fails to clearly and specifically identify and preserve estate causes of action, it does not comply with the requirements of 11 U.S.C. § 1123(b)(3). The Plan therefore cannot be confirmed in its present form.

69.    Confirmation should be denied unless the Plan is amended to include (a) a clear and specific reservation of estate causes of action, (b) preservation of claims against lenders, insiders, and other potential defendants, and (c) an appropriate mechanism—such as the creation of a litigation trust—to pursue such claims for the benefit of the estate and its creditors.

70.    Without these protections, the Plan risks transferring substantial value to the alleged secured creditor while extinguishing potentially valuable estate causes of action belonging to the bankruptcy estate.

**Objection III --- The exculpation and release provisions are impermissibly broad**

71.    The Plan should not be confirmed because the release and exculpation provisions contained in Article 8 impermissibly shield certain parties from liability and risk extinguishing valuable claims belonging to the Debtor's estate.

72.    Section 8.2 of the Plan provides that the Debtor, its officers, directors, members, managers, employees, and professionals shall not incur liability for actions taken in connection

16

with the formulation, preparation, dissemination, confirmation, or consummation of the Plan and related documents.

73.     Although the Plan characterizes this provision as a limitation of liability, it operates as a broad exculpation clause that purports to immunize estate fiduciaries and professionals for conduct occurring during the bankruptcy case.

74.     Courts within the Second Circuit recognize that exculpation provisions must be narrowly tailored and may only protect estate fiduciaries for conduct undertaken within the scope of the chapter 11 case and only for acts other than fraud, gross negligence, or willful misconduct. See *In re MF Global Holdings Ltd.*, 531 B.R. 424, 463–64 (Bankr. S.D.N.Y. 2015).

75.     Even when permitted, exculpation provisions must be carefully scrutinized to ensure that they do not improperly shield parties from liability for breaches of fiduciary duties or other wrongful conduct affecting the bankruptcy estate. See *In re Granite Broadcasting Corp.*, 369 B.R. 120, 140–41 (Bankr. S.D.N.Y. 2007).

76.     The exculpation language in the Plan is particularly problematic when considered together with the Plan's vague reservation of causes of action in Article 6.7. The Plan purports to preserve claims in a generalized manner but fails to identify any specific causes of action or potential defendants.

77.      Courts have repeatedly held that such generalized reservation language is insufficient to preserve estate causes of action after confirmation. See *In re I. Appel Corp.*, 300 B.R. 564, 568 (Bankr. S.D.N.Y. 2003); *In re United Operating, LLC*, 540 F.3d 351, 355–56 (5th Cir. 2008); *In re Ice Cream Liquidation, Inc.*, 319 B.R. 324, 337–38 (Bankr. D. Conn. 2005).

78.     As a result, the Plan risks extinguishing valuable estate claims upon confirmation while simultaneously insulating estate fiduciaries and professionals from liability. This

combination of broad exculpation and inadequate claim preservation threatens to eliminate potential litigation recoveries that could otherwise benefit the Debtor's creditors.

79.    The Bankruptcy Code does not permit a plan to eliminate potential causes of action belonging to the estate without adequate disclosure and specific reservation of those claims.

80.    Creditors voting on a plan must be able to evaluate whether the estate possesses litigation claims that may materially affect recoveries.

81.    Here, the Plan provides no meaningful disclosure regarding potential estate claims, including claims relating to the validity and enforceability of loan documents, the calculation of default interest, the handling of escrow and reserve accounts, or the propriety of foreclosure actions relating to the Debtor's equity interests.

82.    The Plan fails to clearly preserve estate causes of action while simultaneously providing broad protections for estate fiduciaries and professionals, the Court cannot determine whether the Plan is consistent with the requirements of the Bankruptcy Code.

83.    Such provisions exceed what is permitted under § 1125(e) and settled precedent in the Southern District of New York and render the plan unconfirmable.

84.    Confirmation of the Plan should therefore be denied unless the exculpation and release provisions are modified to ensure that (i) estate causes of action are clearly and specifically preserved and (ii) no party is improperly insulated from liability for conduct that may give rise to valid claims belonging to the bankruptcy estate.

**OBJECTION IV. -----The Plan improperly assumes entitlement to default interest**

85.    The Plan improperly assumes that default-rate interest is allowable in favor of the purported loan holder ("Holder").

86.    The Objecting Party does not concede the validity, amount, or secured status of the claim asserted by Maguire Perry LLC ("Maguire Perry") and reserves all rights to challenge the claim through the claims-allowance process.

87.    Even assuming arguendo that Maguire Perry holds an allowed secured claim, the Plan improperly assumes that default interest and related charges are allowable without the evidentiary showing required under applicable law.

88.    Default interest is not automatic in the Second Circuit. A creditor seeking default interest must satisfy the requirements of 11 U.S.C. § 506(b) and demonstrate that such interest is enforceable under applicable nonbankruptcy law. See *In re 785 Partners LLC*, 470 B.R. 126, 133–34 (Bankr. S.D.N.Y. 2012); *In re South Side House, LLC*, 474 B.R. 391, 410–11 (Bankr. E.D.N.Y. 2012).

89.    Under New York law, default interest may be imposed only after a valid and enforceable event of default and only by a party with authority to enforce the loan. See *Aurora Loan Servs., LLC v. Taylor*, 25 N.Y.3d 355, 361–62 (2015); N.Y. U.C.C. §§ 3-203, 3-301.

90.    The present record does not establish that Maguire Perry possessed authority to declare a default at the time the alleged defaults occurred. Public records filed in the New York City Automated City Register Information System ("ACRIS") show that Maguire Perry executed and recorded an assignment of the Note and Mortgage to Felicitas Debt Fund LP on December 28, 2022, prior to the alleged loan defaults.

91.    Maguire Perry's manager submitted a declaration asserting that Maguire Perry is a secured creditor and possesses the loan documents, but the underlying loan documents—

including the note and evidence of the security interest—were not attached to the declaration. See Declaration of Jason Leibowitz ¶ 4 n.2 (ECF No. 25). Where a claimant fails to attach the underlying loan documents, the claim is not entitled to prima facie validity and may be challenged. See *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010).

92.    Where, as here, the record does not establish that a valid default occurred or that Maguire Perry possessed authority to declare a default, the Court cannot determine whether default interest is allowable under 11 U.S.C. § 506(b).

93.    Bankruptcy courts retain equitable discretion to deny default interest where enforcement would be inequitable or where the creditor has not established the factual basis for the default. See *In re Vest Assocs.*, 217 B.R. 696, 703–05 (Bankr. S.D.N.Y. 1998); *In re 1111 Myrtle Ave. Group, LLC*, 598 B.R. 729, 737–39 (Bankr. E.D.N.Y. 2019).

94.    The Plan nevertheless assumes that Maguire Perry is entitled to default interest and related charges without first determining whether such amounts are enforceable under applicable law.

95.    The Bankruptcy Code requires that the validity and amount of a creditor's claim be determined through the claims-allowance process. See 11 U.S.C. §§ 501–502; Fed. R. Bankr. P. 3001. Because the amount of Maguire Perry's claim—including any alleged default interest— has not been established through that process, the Court cannot determine the proper amount of the secured claim for purposes of confirmation.

96.    A plan that assumes the validity of disputed claim components without resolving those disputes fails to comply with the requirements of the Bankruptcy Code and therefore cannot be confirmed. See 11 U.S.C. § 1129(a)(1).

97.     Confirmation should therefore be denied unless the Debtor establishes that a valid

event of default occurred, that Maguire Perry possessed authority under applicable law to declare

that default and impose default interest, and that any such interest is allowable under § 506(b)

following a proper determination through the claims-allowance process.

## RESERVATION OF RIGHTS

98.     The Objecting Party expressly reserves all rights, claims, defenses, objections,

and arguments with respect to the Plan, the claims asserted in this case, and the treatment of any

creditor or interest holder under the Plan. Nothing contained in this objection shall be deemed an

admission of the validity, enforceability, amount, priority, or secured status of any claim asserted

in this case.

## RELIEF REQUESTED

WHEREFORE, for the reasons set forth above, the Objecting Party respectfully requests that the
Court enter an order:

a. Denying confirmation of the Plan without prejudice unless and until the Debtor provides
   amended disclosures and competent evidentiary support establishing the validity, amount,
   and proper treatment of the alleged secured claim;

b. Requiring a full accounting of all borrower-funded escrow and reserve accounts created
   under the loan documents, including the Tax and Insurance Escrow Fund, any Imposition
   Account, Interest Reserve Account, and any collateral reserve accounts established under
   the Broadfield and Fairbridge loan documents;

c. Requiring disclosure and reconciliation of all escrow balances, reserve funds, and
   borrower payments transferred through the assignment chain of the loan, including
   transfers occurring in connection with the First Niagara, KeyBank, Broadfield, and
   Fairbridge transactions;

d. Determining the amount and validity of the alleged secured claim only after such
   accounting, and, if necessary, conducting an evidentiary hearing concerning the amount,
   validity, and enforceability of that claim;

e.  Disallowing or limiting any claim for default interest unless and until the creditor
   establishes (i) a valid event of default, (ii) authority to enforce the loan at the time the

alleged default occurred, and (iii) entitlement to such interest under 11 U.S.C. § 506(b) and applicable law;

f.  Requiring modification of the Plan and related provisions to ensure that any releases, exculpation provisions, or claim treatments conform to applicable Second Circuit and SDNY law;

g.  Requiring the Plan to expressly preserve all estate causes of action and defenses, including those relating to the administration of escrow and reserve accounts, the loan assignment chain, and the calculation of the secured claim; and

h.  Granting such other and further relief as the Court deems just and proper.

[Signature Page Follows]

Dated: Rockville Centre, New York
March 6, 2026

PAUL RACHMUTH LAW OFFICE, PLLC
Attorneys for Benjamin Dixon

By:    /S/  Moira Brennan
Moira Brennan (mb-1126)
Of Counsel

Paul A, Rachmuth (pr-1566)
265 Sunrise Highway, Ste. 1515
Rockville Cente, NY  11570
Paul@paresq.com
(516) 330-0170